**OREGON PACIFIC INDUSTRIES, INC., et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant,**

**and**

**Interstate Commerce Commission, Defendant-Intervenor.**

Civ. No. 73–286.

United States District Court, D. Oregon.

Oct. 18, 1973.

Seymour L. Coblens, Portland, Or., for plaintiff.

Thomas E. Kauper, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Sidney I. Lezak, U. S. Atty., Portland, Or., for defendant U.S.A.

Fritz R. Kahn, Gen. Counsel, Charles H. White, Jr., Atty., I.C.C., Washington, D. C., for defendant-intervenor I.C.C.

Before GOODWIN, Circuit Judge, and EAST and SKOPIL, District Judges.[*]

## MEMORANDUM OF DECISION

EAST, District Judge:

### STATEMENT OF THE CASE

On May 8, 1973, the intervenor Interstate Commerce Commission (Commission), basing its action on the provisions of 49 U.S.C. § 1(15), sua sponte, and without notice and hearing, issued its so-called Service Order No. 1134 (Order). The Order has been from time to time continued and is now in effect.

The plaintiffs instituted these proceedings pursuant to 28 U.S.C. §§ 2321–2325 to annul and enjoin the enforcement of the Order contending, *inter alia,* that:

While the Order purports to deal with car service, it in truth and in fact deals with transportation charges over which the Commission has no authority under § 1(15) to change in the manner attempted by the Commission; and the Order issued without notice or hearing or good cause shown, suspends regularly and duly filed tariffs of the Commission "relating to joint and through [railroad shipping] rates for lumber and plywood in violation of 49 U.S.C. § 6(3) [sic]." [49 U.S.C. § 15(1)]

### JURISDICTION

We note the jurisdiction of this three-judge district court under 28 U.S. C. §§ 2321–2325.

### FACTS

We find from the agreed statement of facts and the affidavits filed herein these pertinent facts: Plaintiffs are Oregon corporations all engaged in the wholesale lumber business. In their business, they cause lumber and plywood purchased and sold by them to be transported from their sources of supply to their customers throughout the United States. The rates charged by railroads for transportation of lumber and plywood affect to a large extent the rate of economic activity in the Northwest and the impact of such rates is vital to the economy of the region and the plaintiffs.

Approximately 75 per cent of all the lumber and plywood produced in the Northwestern states is sold through the

[*] Honorable Alfred T. Goodwin, United States Circuit Judge for the Ninth Circuit, Honorable William G. East, Senior United States District Judge for the District of Oregon, and Honorable Otto R. Skopil, Jr., United States District Judge for the District of Oregon, constituting a statutory three-judge district court by designation of Chief Judge Richard H. Chambers for the Ninth Circuit, dated May 25, 1973.

wholesale arm of the lumber industry. For almost half a century the wholesalers have used a common practice of some form of a diversion or reconsignment of their railroad car shipments while in route from point of origin to or at the original destination under prefixed joint or through railroad shipment rates and charges established under duly filed tariffs as regulated by the Commission under its general powers and appropriate procedure under the Interstate Railroad Transportation Act, after notice and hearing.

In recent years the practice is generally known as wholesalers' sales-in-transit. The wholesaler will ship a given carload or carloads to a given "hold point" with the view that the car or cars will be ultimately diverted or reconsigned to a more distant point of final destination. The railroad joint or through shipping rate from the point of origin to the ultimate final destination is always substantially less than the combined or aggregate of short haul rates between intermediary points. For example, the through rate for a 7500 lb. minimum carload from Pacific Coast shipping points to New York, via the intermediate points of Marshalltown, Iowa, and Chicago, Illinois, is $1432.50, while the aggregate of the three local rates between points totals $2452.00.

The Order applies only to the transportation of lumber and plywood by railroads and provides that in the event carload shipments are held at a transit point more than 120 hours, exclusive of Saturdays, Sundays and holidays, and thereafter forwarded to another destination, or delivered to a newly designated consignee, such shipment will lose the benefit of any applicable through rate from the shipping point to the ultimate destination. Such shipment would be subject to the sum of the local rates which are as pointed out above usually substantially greater in amount.

The railroads of the United States have been struggling with the problem of boxcar shortages, particularly as they affect the lumber and plywood industries, for over fifty years, and the Commission has issued hundreds of Service Orders under 49 U.S.C. § 1(15) in an attempt to alleviate the problem caused by boxcar shortages. However, the Commission has never in the past issued an order pursuant to the claimed authority of 49 U.S.C. § 1(15), which imposed the severe sanctions upon shippers as contained in the Order, or which purported to affect the rights of shippers to make use of a joint or through rate in effect pursuant to a duly filed and authorized tariff. In comparison, the imposition of tariff regulated reasonable time based demurrage charges for cars held at a given point over stated times has been a traditional sanction upon shippers to keep the cars rolling.

### ISSUE

Whatever authority the Commission may have to alleviate the problem of car shortages by prescribing shipping rates and charges through appropriate procedures, with notice and hearing, is not in issue. The basic and sole issue before the court is whether the Commission had Congressional authority under the "emergency" car service section, Title 49 U.S.C. § 1(15), to promulgate and issue the so-called "car service" Order. We hold that it did not.

### DISCUSSION

The authority of the Commission over "car service items" flows from 49 U.S.C. § 1(10), which provides in essential parts, "The term 'car service' . . . shall include the use, . . . movement . . ., and return of . . . cars . . . used in the transportation of property *by any carrier by railroad.* . . . " [Emphasis added.] So it follows that " 'car service' connotes the use to which the vehicles of transportation are put [by a carrier]; not the transportation service rendered by means of them." Peoria & P. U. Ry. Co. v. United States, 263 U.S. 528, 533, 44 S.Ct. 194, 196, 68 L.Ed. 427 (1924).

Paragraph (14) of § 1 is the enabling section or procedural prerequisite for the issuance of the Commission's car service orders. The purpose of car service orders is best explained in United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 743–744, 92 S.Ct. 1941, 1944, 32 L.Ed.2d 453 (1972), through this observation of Mr. Justice Rehnquist:

"The country's railroads long ago abandoned the custom of shifting freight between the cars of connecting roads, and adopted the practice of shipping the same loaded car over connecting lines to its ultimate destination. The freight cars of the Nation thus became in essence a single common pool, used by all roads. This practice necessarily required some arrangements for eventual return of a freight car to the lines of the road which owned it, and in 1902 the railroads through their trade association dealt with this and related problems in a code of car service rules with which the roads agreed among themselves to comply. The effect of the Commission's order now under review is to promulgate two of these rules as the Commission's own, with the result that sanctions attach to their violation *by the railroads.* [Emphasis added.]

"Because of critical freight-car shortages experienced during World War I, Congress enacted the Esch Car Service Act of 1917, which empowered the Commission to establish reasonable rules and practices with respect to car service by railroads. 40 Stat. 101, 49 U.S.C. § 1(14)(a). The pertinent language of that Act provides:

'The Commission may [after hearing] . . . establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter . . . .'" ["including the compensation to be paid . . . for the use of any . . . car . . . not owned by the carrier using it. . . . "]

So we emphasize that § 1(14) contemplates Commission rules and regulations, with respect to car service, applicable, with sanctions, to uses of cars by *railroads* and not by shippers.

Section 1(15) gives the Commission four categories of emergency authority when it is of the opinion that shortages of equipment or other emergencies requiring immediate action exist, at once, with or without notice or hearing:

"(a) to suspend . . . rules, regulations, or practices *then existing* [emphasis added] with respect to car service . . . ,

(b) to make . . . directions with respect to car service . . . during such emergency as . . . will promote . . . service . . . [and provide compensation *as between carriers*].

(c) to require . . . common use of terminals, . . . and

(d) to give directions . . . for preference or priority in transportation. . . ."

Manifestly the expressed authority to the Commission under either of categories (b), (c) or (d) does not support the Order under challenge. Nor does the expressed authority under category (a) give any validity to the Order. The Order does not purport to suspend any rule, regulation or practice then established in connection with car service. On the contrary the Order condones the practice of sales-in-transit, which involves a form of boxcar warehousing for an indefinite time until a diversion or reconsignment occurs but requires shippers employing this practice to pay a higher ultimate shipping rate to the carriers.

Expressed authority to the Commission for fixing shipping rates and charges during a declared emergency under § 1(15) is utterly lacking and none can be rationally inferred or implied from the express language. It has been held that the "sole purpose" of categories (a) and (b) authority is "to

make [railroad cars] available in emergencies to a carrier other than the owner. . . . " Peoria & P. U. Ry. Co. v. United States, supra, 263 U.S. at 533, 534, 44 S.Ct. at 196. Also, the section is no general grant of emergency power to prevent interruptions in traffic "and the detail in which the subjects of such power has been specified precludes its extensions to other subjects by implication." 263 U.S. at 535, 44 S.Ct. at 196.

The intervenor urges the holding of Turner, Dennis & Lowry Lbr. Co. v. Chicago, M. & St. Paul Ry. Co., 271 U.S. 259 at 262, 46 S.Ct. 530, 70 L.Ed. 934, as supportive of the Order. *Turner* did not involve and approve an order issued under § 1(15), but rather an order involving a "demurrage tariff duly filed." The decision is no authority for the Order challenged herein.

■ In summary, we point out that the sole purpose and effect of the Order is to deprive lumber and plywood shippers of the benefit of a long-standing railroad shipping practice, approved under prior lawful rate regulation procedures, and the further benefit of the pre-existing joint and through shipping rates provided therefor; and in turn to substitute for such joint and through rates a combination or aggregate of the local rates between intermediary points resulting in the imposition of sanctions, which approach confiscatory amounts.

The Service Order label and the citation of authority therefor does not mask or legitimatize the illegal rate fixing Order developed through procedures lacking due process.

### CONCLUSIONS OF LAW

We conclude that the Commission was without Congressional authority to issue the Order under the provisions of § 1(15) and acted arbitrarily and unlawfully in the formulation and issuance thereof and that the Order is void from its inception. Accordingly, the plaintiffs are entitled to an Order and Decree herein:

(a) setting aside, vacating and holding for naught the Order in its entirety as of its inception;

(b) restraining and enjoining the Commission and all persons acting on its behalf from the enforcement of the terms and sanctions imposed thereunder; and

(c) allowing plaintiffs' costs.

This Decision shall constitute the court's Findings of Fact and Conclusions of Law as provided in Rule 52(a), Federal Rules of Civil Procedure.