INTERSTATE COMMERCE COMMISSION *v.*
OREGON PACIFIC INDUSTRIES,
INC., ET AL.

No. 73–1210.   Argued November 20, 1974—
Decided February 19, 1975

*Charles H. White, Jr.,* argued the cause for appellant. With him on the brief were *Fritz R. Kahn* and *Betty Jo Christian.*

*Seymour L. Coblens* argued the cause and filed a brief for appellees.*

Opinion of the Court by MR. JUSTICE DOUGLAS, announced by MR. CHIEF JUSTICE BURGER.

This is an appeal from a judgment of a three-judge District Court, 28 U. S. C. § 1253, which held invalid an order of the Interstate Commerce Commission promul-

---

*\*James H. Clarke* filed a brief for Western Railroad Traffic Assn. as *amicus curiae* urging reversal.

gating a car Service Order [1] under § 1 (15) of the Inter-
state Commerce Act, as amended, 41 Stat. 476, 49 U. S. C.
§ 1 (15).[2] *Oregon Pacific Industries* v. *United States,*
365 F. Supp. 609 (Ore. 1973).

---

[1] This Service Order by its original terms was to expire July 31, 1973, unless otherwise modified or changed by the Commission. 38 Fed. Reg. 12606. The Commission twice extended the deadline, *id.,* at 19831, 31681, and on April 11, 1974, made it effective "until further order of the Commission," 39 Fed. Reg. 13971, on each occasion having found "good cause" for the extension. The April 11 amendment also suspended the Service Order indefinitely, effective April 15, 1974.

The Solicitor General without citation of any authority expressed his view that the District Court's decision was correct and moved that its judgment be affirmed. The Western Railroad Traffic Association has filed an *amicus* brief taking the opposing view.

[2] Section 1 (15), 49 U. S. C. § 1 (15), provides:

"Whenever the Commission is of opinion that shortage of equipment, congestion of traffic, or other emergency requiring immediate action exists in any section of the country, the Commission shall have, and it is hereby given, authority, either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleading by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the Commission may determine: (a) to suspend the operation of any or all rules, regulations, or practices then established with respect to car service for such time as may be determined by the Commission; (b) to make such just and reasonable directions with respect to car service without regard to the ownership as between carriers of locomotives, cars, and other vehicles, during such emergency as in its opinion will best promote the service in the interest of the public and the commerce of the people, upon such terms of compensation as between the carriers as they may agree upon, or, in the event of their disagreement, as the Commission may after subsequent hearing find to be just and reasonable; (c) to require such joint or common use of terminals, including main-line track or tracks for a reasonable distance outside of such terminals, as in its opinion will best meet the emergency and serve the public interest, and upon such terms as between the carriers as they may agree upon, or, in the event of their disagreement, as the Commis-

Lumber is often moved to market on a wholesalers' sale-in-transit schedule. Cars are sent to hold points, where in time reconsignment orders are received for shipment to customers of wholesalers. The tariffs allow indefinite holding, subject to demurrage charges for detention in excess of 24 hours, but the Commission found that these demurrage charges never discouraged shippers from lengthy holding of cars. In 1973 there was, according to the Commission, a transportation "emergency" which required "immediate action to promote car service in the interest of the public and the commerce of the people." Accordingly, on May 8, 1973, the Commission, *sua sponte*, without notice and hearing, entered its Service Order No. 1134 which limited the hold time at reconsignment points to five days (120 hours), exclusive of Saturdays, Sundays, and holidays. If the lumber cars were held at reconsignment points longer than five working days, the reconsignment privilege would be lost and the shippers would be subject to local or joint tariff rates from the point of origin to the hold point, and from the hold point to the ultimate destination.

The District Court held that there were four categories of emergency action which the Commission could take under § 1 (15):

"(a) to suspend . . . rules, regulations, or practices then established with respect to car service . . . ,

sion may after subsequent hearing find to be just and reasonable; and (d) to give directions for preference or priority in transportation, embargoes, or movement of traffic under permits, at such time and for such periods as it may determine, and to modify, change, suspend, or annul them. In time of war or threatened war the President may certify to the Commission that it is essential to the national defense and security that certain traffic shall have preference or priority in transportation, and the Commission shall, under the power herein conferred, direct that such preference or priority be afforded."

"(b) to make . . . directions with respect to car service . . . during such emergency as . . . will best promote . . . service . . . [and provide compensation as between carriers].

"(c) to require . . . common use of terminals, . . . and

. "(d) to give directions for preference or priority in transportation . . . ."

The District Court held that the Commission's authority under (b), (c), or (d) would not support the order in this case and that the order could be sustained, if at all, only under (a). It concluded that (a) was not adequate since the challenged order did not "suspend" any rule or regulation "with respect to car service." It reasoned that the order "condones the practice of sales-in-transit" for an indefinite time but requires shippers employing the practice to pay a higher rate to the carriers than the demurrage rate under the prior order. That was, in its view, a rate order having no place under § 1 (15), which gives the Commission power to act *sua sponte* in an "emergency" in a narrow group of cases. 365 F. Supp., at 612.

The District Court pointed out that § 1 (10) defines "car service" as "the use . . . movement . . . and return of . . . cars . . . used in the transportation of property . . . by any carrier by railroad"; and it emphasized that " 'car service' connotes the use to which the vehicles of transportation are put [by a carrier] ; not the transportation service rendered by means of them," 365 F. Supp., at 611; *Peoria & P. U. R. Co.* v. *United States,* 263 U. S. 528, 533. We emphasized in *United States* v. *Allegheny-Ludlum Steel Corp.,* 406 U. S. 742, 743, that car service rules dealt with the management of "a single common pool" of cars "used by all roads," and that they pertain to railroad use

of cars. Since "railroad use" involves shippers, we think the District Court read § 1 (15) too narrowly.

We noted in *Allegheny-Ludlum* that § 1 (15) traces back to the Esch Car Service Act of 1917, 40 Stat 101.[3] 406 U. S., at 744. The use of freight cars as warehouses—the practice which prompted the Commission to act in the present case—was one of the evils at which the original Car Service Act was aimed.

Mr. Esch, sponsor of the legislation, said: [4]

"Another cause of car shortage is the holding of cars on the part of shippers themselves, using the car as a species of warehouse, instead of promptly unloading it. I think that is quite a universal evil throughout the United States, but it is due in some measure to the lack of warehouse and elevator facilities at the terminals.

.        .        .        .        .

"Mr. MADDEN. If the gentleman will yield to me, I would like to ask him one question. I would like to ask the gentleman if there is any provision in this bill to compel railroad companies to pay demurrage to the shippers in case they failed to furnish the cars within the time they were required for the shipment of the goods?

"Mr. ESCH. The gentleman means reciprocal demurrage?

"Mr. MADDEN. This gives the Interstate Commerce Commission the right to authorize them to charge certain demurrage of the shipper if he fails to unload the car. Ought not the shipper to have a claim against the railroad company in case they fail to furnish the cars?

---

[3] See H. R. Rep. No. 18, 65th Cong., 1st Sess.; S. Rep. No. 43, 65th Cong., 1st Sess.

[4] 55 Cong. Rec. 2020–2021.

"Mr. ESCH. I have no doubt under the proposed amendment, in case of emergency, the commission could make any rules or regulations that they saw fit that would promote the transit of freight, because the power is very broad, and necessarily so."

And the Reports make clear that one aim of the Act was "to the end that the public may receive the best possible service in transportation." [5] Car shortages, it was found, resulted in short supplies of basic foods in the markets "with attendant high prices." [6] The interests of shippers and consumers—not the carriers alone—were very much in the forefront.

As we have noted, *Peoria & P. U. R. Co., supra,* emphasized that the car service authority extends to the "use" of cars and not to a "transportation service," but there the issue was whether one carrier was bound to perform switching services for another carrier. The Court held that it was not; power over the "use" of cars, however, was left undisturbed. In this connection it is obvious that a shipper by rail does not "rent" a vehicle as do shippers by truck. The cars are all "used" under the management of carriers, who naturally receive directions or requests from shippers. The cars cannot be used efficiently to serve the needs of shippers and consumers if they are used not as carriers but as warehouses.

In *Turner Lumber Co.* v. *Chicago, M. & St. P. R. Co.,* 271 U. S. 259, demurrage to prevent "undue detention" of cars "loaded with lumber held for reconsignment" was fixed by the Commission without notice. The Court, speaking through Mr. Justice Brandeis, upheld the charge saying: "All demurrage charges have a double purpose. One is to secure compensation for the use of the car and of the track which it occupies. The other is to promote car effi-

---

[5] S. Rep., *supra*, n. 3, at 2.
[6] H. R. Rep., *supra*, n. 3, at 1.

ciency by providing a deterrent against undue detention."
*Id.,* at 262. In *Iversen* v. *United States,* 63 F. Supp. 1001,
aff'd *per curiam,* 327 U. S. 767, the Commission entered
a car Service Order limiting reconsignment privileges to a
specific number of days and providing that cars held in ex-
cess of that time would be subject to the sum of the local
rates from origin to reconsignment point to destination.[7]
It was held that the demurrage item was a "rule" respect-
ing "car service" within the meaning of § 1 (15). The
holding in *Iversen* was implicit in the holding in *Turner.*[8]

The District Court suggested that the Service Order
was invalid because its effect was to "fix" rates and
charges during an emergency—a power not covered by
§ 1 (15). That precise point was raised in *Iversen,* 63
F. Supp., at 1006, and the ruling, which we affirmed,
was *contra.* Suspending or changing demurrage charges

---

[7] *Iversen* v. *United States,* involved four Service Orders of the
Commission. Service Order No. 396 in that case was on all fours
with the one in the instant case. In *Iversen,* Judge Prettyman,
speaking for a three-judge District Court, said:
"[D]emurrage charges are in part compensation and in part
penalty; . . . in full character they are neither, not being rates as
that term is used in connection with rate-making, nor penalties as
that term is used in respect to penal impositions. They are sui
generis. Historically, textually, in purpose and in content, they are
an integral part of the established rules and regulations relating to
the use and movement of cars. From the beginning they have been
sustained as rules and regulations. They could not have been
sustained as carrier charges or as penalties. As an integral part
of the rules and regulations in respect to car service, they fall within
the provisions of Section 1 (15) of the Interstate Commerce Act.
It follows that when an emergency exists, the Commission can, with-
out hearing, issue, effective for a limited time, orders in respect to
these charges." 63 F. Supp., at 1005–1006.

[8] The District Court distinguished *Turner* on the ground that it
involved a "demurrage tariff duly filed," 271 U. S., at 260. But it
was filed by reason of § 1 (15) during an "emergency" and, as in
the present case, "without notice." 271 U. S., at 260.

may increase the transportation charges; but, as *Turner* makes clear, demurrage charges have a dual purpose; and it is enough if one of them is a deterrent against undue detention of cars. As we said in *Turner*, at times the cause of "undue detention" of freight cars is that they are used "as a place of storage, either at destination or at reconsignment points, for a long period while seeking a market for the goods stored therein." 271 U. S., at 262. The substitution of tariff rates already fixed and on file for the old demurrage rate is not an unreasonable method of accelerating the movement of freight cars. That was the aim and purpose of the present Service Order; and it was promulgated in an "emergency" [9] which the Commission, using its expertise, found to exist. We cannot say the order was unreasonable on the record before us. Insofar as appellees raise questions of unfairness, they are precluded by the opinions of Mr. Justice Holmes in *Avent* v. *United States,* 266 U. S. 127, and of Mr. Justice Brandeis in *Turner Lumber Co.* v. *Chicago, M. & St. P. R. Co., supra,* which disposed of due process questions under § 1 (15). We therefore hold that the Commission had the power to promulgate Service Order No. 1134 summarily.[10]

*Reversed.*

Mr. Justice Powell, concurring.

I am in agreement with the Court's opinion that the Interstate Commerce Commission had the power under

---

[9] A car Service Order of the Commission issued July 25, 1922, because of an "emergency" without notice and hearing was sustained in *Avent* v. *United States,* 266 U. S. 127, against the claim that the order violated the Fifth Amendment.

[10] This is the only question we decide today. The Commission's present obligation with respect to the promulgation of car service rules, the issue that concerns our Brother Powell, has not been raised by counsel here or in the court below, and, accordingly, is a matter we do not address.

§ 1 (15) summarily to take the action which is the subject of this litigation. I believe, however, that in addition to reversing the judgment of the District Court, we should direct that the case be remanded for a prompt proceeding under § 1 (14) of the Act.

The Commission entered Service Order No. 1134 on May 8, 1973, without notice, hearing, or an opportunity by interested parties to submit evidence or grounds of objection. The Commission found, as it had to under § 1 (15):

> "[A]n emergency exists requiring immediate action to promote car service in the interest of the public and the commerce of the people. Accordingly, the Commission finds that notice and public procedure are impracticable and contrary to the public interest . . . ."

The Commission's counsel stated at oral argument that while the car shortage problem has a long history, the present order was in response to a particularly sharp but temporary increase in the severity of the problem. Counsel acknowledged, however, that this temporary emergency has subsided and that the order has been maintained in effect largely because of this litigation.[1]

Summary action is justified by the need to prevent imminent and severe public harm, harm that could not be avoided were action delayed. In authorizing this type of action, Congress implicitly concluded that avoidance of the public harm justifies bypassing normal procedures.

---

[1] Although originally drawn to expire July 31, 1973, the Commission later continued it in effect, while suspending its application, "until further order of the Commission." 39 Fed. Reg. 13971. The order was vacated, however, by the District Court on October 18, 1973, some five and a half months after its promulgation. Presumably, our reversal of the District Court will allow the Commission, in its discretion, to lift the suspension of the order without any renewed finding of emergency.

But the justification for summary action ends with the emergency that called it forth.

No reason has been given us why the normal procedures with respect to "car service" rules under § 1 (14) should not now be followed.[2]   Although these do not require a full adversary hearing, due notice must be given all interested parties, with the opportunity to object, submit evidence, and file briefs in support of their position.   *United States* v. *Florida East Coast R. Co.*, 410 U. S. 224 (1973); *United States* v. *Allegheny-Ludlum Steel Corp.*, 406 U. S. 742 (1972).

The Court's reversal of the District Court's decision, without more, will result in the vacating of its order of October 18, 1973, restraining enforcement of the Commission's emergency order of May 8, 1973.   Absent the restraining order of the District Court, the emergency car service rules apparently will remain in effect.   I think it unfortunate to leave the case in this posture.   Accordingly, in addition to reversing the judgment of the District Court, I would direct that the case be remanded to the Commission with directions that it proceed promptly in accordance with the requirements of § 1 (14) to determine what changes, if any, are required in the car service rules.

---

[2] The procedural safeguards afforded by § 1 (14), and which the Commission must follow absent an emergency, not only afford protection to the interests of private parties affected by agency action; they also insure that the agency has before it the information necessary to make a decision reasonably accommodating diverse and often competing public interests.   Summary action may result in the imposition of hardships which, upon a more adequate consideration, will prove to have been unnecessary.   See Freedman, Summary Action by Administrative Agencies, 40 U. Chi. L. Rev. 1, 27–30 (1972).