**CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

**No. 80–2006.**

United States Court of Appeals, Seventh Circuit.

Argued April 19, 1981.

Decided Sept. 23, 1981.

---

Robert S. Medvecky, Reid & Priest, Washington, D. C., for petitioner.

Craig M. Keats, I. C. C., Washington, D. C., for I. C. C.

John A. Daily, Philadelphia, Pa., for Consolidated Rail Corp.

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

1. Debit charges computed under the straight demurrage method (under the tariff in force at relevant times of this case, Freight Tariff 4–K, ICC H–74, General Car Demurrage Rules and Charges, effective July 1, 1977) are based on a formula of $10 for each of the first four chargeable days, $20 for each of the next two days, and $30 for each subsequent day. No credits are available under the straight demurrage method to offset these charges.

Before PELL and BAUER, Circuit Judges, and CAMPBELL *, Senior District Judge.

WILLIAM J. CAMPBELL, Senior District Judge.

This is an appeal by the Central Illinois Public Service Commission (CIPS) from a decision of the I.C.C. denying reparations of the penalty portion of demurrage charges assessed against it by ConRail. CIPS attacks not only the decision on the merits, but also the procedural action of the I.C.C. in reopening the proceeding for the admission of additional evidence. Jurisdiction is predicated upon 28 U.S.C. § 2321(a), and is not contested by any party.

Railroads assess demurrage charges when shippers hold railway cars for loading or unloading longer than a specified period, called "free time." The appropriate charge and the period of the free time are set by tariff and have nationwide application. The tariff offers two alternative methods of computing demurrage. Under "straight demurrage," the charges are computed separately on each car delivered to the shipper, and the shipper is entitled to additional periods of free time in specific situations such as bad weather, frozen lading, strikes or bunching of cars.[1] The alternate method of computing demurrage charges is the "average agreement" under which the early release of cars by the shipper provides it with credits which can be used to offset debits on other cars held beyond the free time.[2] However, in return for that benefit, the shipper loses the right to receive extra free time for bunching, bad weather, or strikes.[3]

2. The debit charges under the average agreement are computed under the same formula as used for straight demurrage. See footnote 1, supra. However, a credit is earned for each car released prior to the expiration of the first twenty-four hours of free time, but each credit can only be used to offset one of the $10 debit charges incurred during that month.

3. The only exception is that the shipper can obtain two extra days of free time if the delay is caused by frozen lading, provided the shipper certifies to the carrier within ten days his efforts to unload the cars.

The average agreement is contractual in nature but does not consist of an extensive contract since all the terms are set forth in the applicable tariff. The shipper merely indicates on its application to the carrier that it wants its demurrage charges assessed under the average agreement method and the contract becomes effective when the carrier approves the application. If no preference is noted, the straight demurrage method is automatically applied. A shipper who chooses the average agreement can cancel it by written notice and said cancellation becomes effective upon the first day of the month following notice.

CIPS is an electric and gas utility which operates an electrical generating station at Hutsonville, Illinois. This station is fueled by coal which is normally obtained from union mines and delivered by trucks. However, in the winter of 1977–1978 the United Mine Workers of America went on strike, and CIPS was obligated to obtain coal from other sources. It arranged for the purchase of coal from non-union mines in Kentucky and the coal was shipped to Hutsonville by ConRail. During the period of January through April 1978, CIPS received approximately 1,330 cars of coal and due to the severe winter the lading was frozen. This caused difficulties and delays in unloading and CIPS was assessed $1,437,690 in demurrage charges by ConRail.

CIPS petitioned the I.C.C. for reparations in an amount representing the penalty portion of the demurrage charge.[4] CIPS argued that the delay was due to the severe weather conditions and that it exercised due diligence in unloading the cars, e. g., using extra work shifts and special machinery, thereby expending an additional $289,-000. ConRail argued that the charges were computed under an average agreement, and that therefore CIPS cannot assert weather interference as a bar to the charges.

The Administrative Law Judge (ALJ) to whom the case was referred ruled in favor of CIPS and concluded that ConRail's failure to prove the existence of the average agreement was fatal to its "defense" that weather interference does not justify reparations. ConRail sought a reopening of the proceeding and the Commission Review Board granted that request, concluding that CIPS had failed to establish a prima facie case and that the record contained contradictory factual assertions which could easily be resolved by additional evidence. Basically, the Board determined that CIPS had not been specific enough as to the charges contested and had failed to introduce evidence as to the applicable tariff by which the charges were computed.

ConRail then submitted documentation which convinced the Review Board that the parties were operating under an average agreement during January and February 1978. CIPS contested the reopening of the case, and declined to submit any additional evidence despite the Board's explicit finding that it had failed to make a prima facie case in the original hearing. The Board subsequently reversed the ALJ's decision, finding that the applicable tariff regulations under the average agreement did not permit relief for demurrage charges resulting from severe weather conditions. The Board also found that certain of the cars received by CIPS during March and April of 1978 were not subject to the average agreement, but that CIPS was not entitled to reparations because it had not sustained its burden of showing due diligence as to them.

**4.** As noted in *I. C. C. v. Oregon Pacific Industries, Inc.*, 420 U.S. 184, 95 S.Ct. 909, 43 L.Ed.2d 121 (1975):

"Demurrage charges are in part compensation and in part penalty; ... in full character, they are neither, not being rates as that term is used in connection with rate-making nor penalties as that term is used in respect to penal impositions. They are *sui generis,*" 420 U.S. at 190, footnote 7, 95 S.Ct. at 913, footnote 7, quoting *Iversen v. United States,* 63 F.Supp. 1001 (1946), (Three-Judge District Court), aff'd per curiam, 327 U.S. 767, 66 S.Ct. 825, 90 L.Ed. 998 (1946). The compensation portion of the demurrage charge is that amount which adequately compensates the carrier for its losses and expenses resulting from the shipper's detention of the cars. The portion of the demurrage charge in excess of that amount is the penalty portion.

■ Petitioner argues that the Commission erred in reopening the proceeding because the case did not involve "material error, new evidence, or substantially changed circumstances" as required by 49 U.S.C. § 10327(g)(1) and 49 C.F.R. § 1100.-98(d), (Rule 98(d)). The standard of review on this issue is whether the Commission abused its discretion by reopening the case, *United States v. I. C. C.*, 396 U.S. 491, 520, 90 S.Ct. 708, 722, 24 L.Ed.2d 700 (1970).

The Review Board concluded that CIPS had failed to establish a prima facie case for reparations. It noted that CIPS had not cited the applicable tariff under which it was charged demurrage, as required by 49 C.F.R. § 1100.29(a), (Rule 29).[5] Additionally, the Board found that CIPS had not complied with 49 C.F.R. § 1100.27, (Rule 27),[6] which requires reasonable specificity with regard to the charges in issue, the dates upon which cars were received, and the number of cars received.

■ A review of CIPS submissions to the ALJ reveals that although it provided copious information as to the severity of the winter and the various methods used to unload the frozen lading, it was not so accommodating as to the matters addressed by Rule 27. CIPS factual presentation merely provided:

(1) A statement by an employee that during January and February of 1978 CIPS received 1,333 cars at its Hutsonville station;

(2) A statement of an employee that CIPS was required to pay $1,437,690 in demurrage charges for 1978;

(3) A chart showing the number of cars unloaded per day at Hutsonville from January 26, 1978 to April 20, 1978.

**5.** Rule 29(a) provides:
(a) Tariff or Schedule References. The several rates, fares, charges, schedules, classifications, regulations, or practices on which complaint is made should be set out by specific reference to the tariffs or schedules in which they appear, whenever that is practicable.

**6.** Rule 27 incorporates the requirements of Rule 23(b) (49 C.F.R. § 1100.23(b)), which provides in pertinent part:

Thus, CIPS did not submit a copy of its application to the carrier (which would indicate the appropriate tariff) or a single bill which would reflect the computation of the demurrage charges and the accumulation of cars at Hutsonville. CIPS did not provide information as to the specific dates on which cars were received or the number of cars received on any given date. These facts were crucial since CIPS had to show that it had been diligent not only in attempting to unload the cars, but also by stopping shipments when the Hutsonville station was hopelessly behind schedule in unloading the cars, see *The Arundel Corporation, et al. v. Columbus & Greenville Ry. Company*, (I.C.C. No. 36945, April 12, 1979). Although CIPS provided evidence that it had taken steps to stop incoming shipments on February 14, 1978, it was impossible to determine, without any figures as to the accumulation of cars at Hutsonville, whether that stop order was timely.

CIPS had the burden of proving due diligence, *Prince Mfg. Co. v. Norfolk & Western Ry.*, 356 I.C.C. 702 (1978), and the Commission was not unreasonable in concluding that it had not made a prima facie showing on that issue. Having determined that the prevailing party had failed to present a prima facie case, the Commission was well within the limitations of § 10327(g)(1) in finding "material error" in the proceedings.

■ Petitioner argues that subsequent to the reopening of the case the Commission erred in denying reparations because ConRail failed to prove the existence of an average agreement. This argument ignores the requirement of Rule 29, see footnote 5 supra, and simply does not make any sense.

"An informal complaint seeking damages, when permitted under the act, must be filed within the statutory period, and should contain such data as will serve to identify with reasonable definiteness the shipments or transportation services in respect of which damages are sought. Such complaint should state: . . . (5) the period of time within which or the specific dates upon which the shipments were made, and the dates when they were delivered or tendered for delivery."

CIPS filed this action seeking reparations for demurrage charges assessed against it pursuant to its agreement with ConRail. In that agreement, as embodied in its application to the carrier, CIPS had to designate whether it wanted demurrage charges to be computed under the straight plan or pursuant to the average agreement method.[7] It is hardly a revolutionary concept of jurisprudence that a party seeking relief from the terms of an agreement has the initial burden of proving the existence of the agreement and its relevant terms. CIPS never designated the appropriate tariff, nor did it provide any documentary evidence from which the method used to compute the demurrage charges could be ascertained. Thus, we are not persuaded that ConRail had the initial burden of proving the applicable tariff provisions or that any such burden shifted to it after CIPS presentation.

As noted previously, CIPS did not submit any additional evidence subsequent to the reopening of the case. Having upheld the Commission's determination that the petitioner failed to present a prima facie case before the ALJ, we need not address petitioner's other arguments relating to the decision on the merits. Since CIPS had not presented a prima facie case, the Commission was required to deny reparations.

Accordingly, we affirm the decision of the Commission.

PELL, Circuit Judge, dissenting.

The majority opinion results, not in upholding reasonable compensation to ConRail for demurrage for the detention of its cars, but instead results in the imposition of a substantial penalty even though unfavorable weather, creating conditions beyond the control of CIPS, prevented the unloading of the cars. I think the result reached is not legally correct on the facts of this case and I therefore respectfully dissent.

Initially, I note that it is virtually hornbook law that the right to a penalty must be clear under the law in order to exact a penalty in a civil case, *Anuchick v. Transamerican Freight Lines, Inc.*, 46 F.Supp. 861, 867 (E.D.Mich.1942). Penalties and forfeiture are considered harsh and should be avoided whenever possible, *General Ice Cream Corp. v. Benson*, 113 F.Supp. 107, 109 (N.D.N.Y.1953), *affirmed*, 217 F.2d 646 (2d Cir. 1954). Putting it another way, the law does not lightly impose penalties and the courts look with disfavor on forfeitures, *BACA v. Commissioner*, 326 F.2d 189, 191 (5th Cir. 1964). Penalties in civil actions are not favored by the courts, and should not be imposed except in cases that are clear and free from doubt, *World Insurance Co. v. Pipes*, 255 F.2d 464, 472 (5th Cir. 1958).

While there can certainly be no doubt that the substantial amount of the sum claimed in this case by ConRail is a penalty and forfeiture pure and simple, even if the law were not as outlined above in disfavoring the imposition of such penalties in civil cases, it seems palpable on the facts of this case that there was no basis in law or in fact for the position that CIPS had contracted for an "average agreement." The Review Board in a maneuver which I regard as violative of elementary principles of due process reopened the case on the basis that CIPS had failed to make a prima facie case at the original hearing. Yet the majority opinion makes it clear that an "average agreement" can only result from an indication on an application to the carrier that the demurrage charges are to be assessed under the "average agreement" method. As there was no proof of this at the original hearing, irrespective of where the burden of proof rested, then a prima facie case had been made for "straight demurrage."

Demurrage was applicable to the situation and it had to be by one method or the other. Failure to show an application for "average agreement" left the situation as

---

7. As noted previously, if the shipper wants demurrage assessed under the average agreement method, it has to explicitly state that on its application, and the failure to make a specific request triggers the application of the straight plan. Thus, explicitly or implicitly, the shipper indicates on the application its choice as to the appropriate tariff provisions.

being one of straight demurrage. I cannot conceive any reason for the Review Board under these circumstances reopening the case although, of course, the allowance of the penalty no doubt was of substantial help to a faltering railroad system which apparently has not been able to succeed financially on the basis of the ordinary tariff system provided by law.

The majority opinion faults CIPS for not submitting in evidence a copy of its application to the carrier. The plain fact is that in the absence of such an application the straight demurrage plan is triggered (see footnote 7 of the majority opinion). Even after the case was reopened in violation of the requirements of 49 U.S.C. § 10327(g)(1) and 49 C.F.R. § 1100.98(d), (Rule 98(d)), there was no proper evidence showing an opting for an "average agreement." The majority opinion charitably refers to the additional proof submitted after the case was reopened as "documentation which convinced the Review Board that the parties were operating under an average agreement during January and February 1978." Conspicuously, the majority opinion does not indicate that any of this evidence had any probative value. Indeed it consisted of nothing more than an application for credit submitted by CIPS to the New York Central Railroad, audit statements, and a copy of a form bill. There is no showing in any of the material that CIPS had "explicitly" stated on any application that it wanted an "average agreement." The only document involving any kind of an application is a wholly unreadable document on the letterhead of an entirely different railroad, the New York Central, which seems to be dated, as nearly as one can tell, in 1921. While the majority opinion virtually ignores this so-called additional evidence, the Interstate Commerce Commission in its brief relies substantially upon the so-called evidence and in its brief, without any reference to the record, traces the merger of the New York Central into the Penn Central and cites cases to the effect that ConRail was the legal successor-in-interest to the Penn Central railroad whose operations it assumed.

I agree with CIPS that it would require "an incredible leap of faith" to conclude that an agreement with ConRail's remote predecessor was still valid nor is the situation changed if upon some other occasion CIPS had actually paid on an "average agreement" basis. I find no support in what happened some other time for what the agreement was on the shipments in question and in the absence of probative evidence the straight demurrage, basis should have been applicable.

We are prone to use the characterization of "gross miscarriage of justice" primarily in situations involving an individual who, by unjust incarceration, is deprived of his liberty to be at large. We perhaps find it less applicable when an unjust monetary loss is visited on a public utility engaged in the business of supplying energy, even though operational costs will probably ultimately be passed on to the consuming public. Nevertheless, it appears to me that the characterization has some justification in this case.