**ILLINOIS CENTRAL GULF RAILROAD COMPANY, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

No. 82–1046.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 20, 1982.

Decided March 14, 1983.

Rehearing and Rehearing En Banc Denied Aug. 9, 1983.

Howard D. Koontz, Chicago, Ill., for petitioner.

Timm L. Abendorth, I.C.C., J. Raymond Clark, Washington, D.C., for respondents.

Before WOOD, Circuit Judge, SWYGERT, Senior Circuit Judge, and CAMPBELL,* Senior District Judge.

SWYGERT, Senior Circuit Judge.

Illinois Central Gulf Railroad Company petitions for review of a decision of the Interstate Commerce Commission in which the ICC affirmed an order of the Railroad Commission of Kentucky requiring the Railroad to refund certain demurrage charges. These charges had originally been paid to the Railroad by intervening respondent Union Carbide Corporation. This petition apparently involves a matter of first impression under sections of the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895. For the reasons set forth below, the order of the ICC is reversed and the case remanded with directions to set aside the order of the Kentucky Commission.

I

The facts are not disputed. In December 1978 and January 1979 Union Carbide shipped 143 cars of coal from Ravenna, Kentucky, to its plant at Kevil, Kentucky, serviced by the Railroad. Because of extreme cold weather, the coal arrived at the plant frozen in the rail cars. Union Carbide had difficulty unloading the coal, and kept the cars in excess of the "free time" specified by its "average agreement" with the

---

* The Honorable William J. Campbell, United States Senior District Judge for the Northern District of Illinois, is sitting by designation.

Railroad.[1]  The Railroad assessed demurrage charges pursuant to the applicable tariff.  Union Carbide paid the charges.

On December 18, 1980 Union Carbide filed a complaint with the Kentucky Commission against the Railroad seeking a refund of the penalty portion of the demurrage charges.[2]  Union Carbide contended that the penalty charges were unreasonable, given the extreme weather and its diligence in unloading the coal.  The Kentucky Commission agreed, and in its decision of September 9, 1981 ordered the Railroad to return $158,690.80 in demurrage charges to Union Carbide.[3]  The Kentucky Commission noted that the "extraordinary combination of unusually low temperatures and unusually high precipitation" could not have been foreseen, and ruled that in this case the average agreement was "unenforceable as contrary to the public interest and public policy."[4]

The Railroad subsequently filed its petition for review with the ICC,[5] arguing that

the decision of the Kentucky Commission not to enforce the average agreement was in violation of 49 U.S.C. § 11501, as amended by section 214 of the Staggers Act, which in relevant part requires that a state authority exercise jurisdiction "exclusively in accordance with the provisions of this subtitle."  The ICC affirmed the Kentucky Commission.[6]  Although noting that "the I.C.C. generally enforces average agreements," and that "the penalty portion of demurrage could arguably indirectly affect carrier revenues to the extent that it encourages efficient car utilization by shippers," the ICC in this case found that the "Kentucky Commission's decision is within the limits of the discretion remaining to the states."  This petition for review by this court followed.

II

As a preface to our consideration of section 214 of the Staggers Act, we note that

1. Railroads assess demurrage charges when shippers hold railway cars for loading or unloading longer than a specific period, called "free time."  The appropriate charge and the period of the free time are set by tariff and have nationwide application.  The tariff offers two alternative methods of computing demurrage.  Under "straight demurrage," the charges are computed separately on each car delivered to the shipper, and the shipper is entitled to additional periods of free time in specific situations such as bad weather, frozen lading, strikes or bunching of cars.  The alternate method of computing demurrage charges is the "average agreement" under which the early release of cars by the shipper provides it with credits which can be used to offset debits on other cars held beyond the free time.  However, in return for that benefit, the shipper loses the right to receive extra free time for bunching, bad weather, or strikes.
*Central Illinois Public Service Co. v. ICC,* 659 F.2d 820, 821 (7th Cir.1981).

2. "The compensation portion of the demurrage charge is that amount which adequately compensates the carrier for its losses and expenses resulting from the shipper's detention of the cars.  The portion of the demurrage charge in excess of that amount is the penalty portion."
*Central Illinois Public Service Co. v. ICC,* 659 F.2d at 822 n. 4.

3. On October 14, 1981 the Kentucky Commission denied the Railroad's petition for reconsid-

eration and ordered the Railroad to pay interest of eight percent on the demurrage charges returned to Union Carbide.

4. *Order of the Railroad Commission of Kentucky, Union Carbide Corp., Nuclear Division v. Illinois Central Gulf Railroad,* Docket No. 972, Sept. 9, 1981.

5. 49 U.S.C. § 11501 provides:
(c) Any rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title may petition the Commission to review the decision of any State authority, in any administrative proceeding in which the lawfulness of an intrastate rate, classification, rule, or practice is determined on the grounds that the standards and procedures applied by the State were not in accordance with the provisions of this subtitle.  The Commission shall take final action on any such petition within 30 days after the date it is received.  If the Commission determines that the standards and procedures were not in accordance with the provisions of this subtitle, its order shall determine and authorize the carrier to establish the appropriate rate, classification, rule, or practice.

6. *Illinois Central Gulf Railroad Co., Petition to Review Order of Kentucky Railroad Commission,* I.C.C., Docket No. 38727, Dec. 10, 1981.

in this case the ICC assumes the curious position of urging affirmance of a decision that an average demurrage agreement should not be upheld. As the Railroad points out, in the past the ICC has been adamant in its enforcement of average agreements notwithstanding a shipper's claim of inclement weather and due diligence in unloading cars.[7] Most recently, in *Cleveland Electric Illuminating Co. v. ICC,* 685 F.2d 170 (6th Cir.1982), the ICC successfully persuaded the Sixth Circuit that the Commission's long-standing policy was to enforce average agreements. In that case, as here, the shipper sought relief from demurrage charges assessed pursuant to an average agreement. The shipper argued that because the coal arrived frozen in the rail cars, and because all means of unloading the coal had been utilized, the demurrage charges assessed were unreasonable. In upholding the ICC's decision not to excuse demurrage charges, the court recognized that

> [r]ecent cases addressing the issue presented in this appeal have been uniform in their adherence to the policy that penalty demurrage should not be excused where an average agreement is in effect. We join the Third and Fourth Circuits in holding that the Commission has consistently applied this policy.

*Id.,* 685 F.2d at 174.[8]

[1, 2] Given the consistent policy of the ICC to enforce average agreements, the issue then becomes whether, as the Railroad contends, the decision of the ICC to deviate from that policy is "arbitrary or capricious," or "an abuse of discretion," or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976). We are aware of the deference due an agency's construction of a statute committed to its administration, *see, e.g., Red Lion Broadcasting v. F.C.C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), and that more than mere deference is appropriate where a court examines a regulation promulgated by an agency pursuant to congressionally-delegated authority. *Batterton v. Francis,* 432 U.S. 416, 424–26 & n. 9, 97 S.Ct. 2399, 2404–06 & n. 9, 53 L.Ed.2d 448 (1977). Here, however, no regulation of the ICC is under consideration, and, as conceded at oral argument, the ICC has not changed its position in regard to the enforcement of average agreements where it acts in the first instance (as opposed to its quasi-appellate function under section 11501). Our task then is one of statutory interpretation, "an area in which courts are the final authority." *Western Coal Traffic League v. United States,* 694 F.2d 378, 383–84 (5th Cir.1982); *Federal Election Commission v. Democratic Senatorial Campaign Commission,* 454 U.S. 27, 31–32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981) ("[courts] must reject administrative constructions of the statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement").

### III

Section 214(b)(1) of the Staggers Act (currently codified at 49 U.S.C. § 11501(b)(1)) provides in relevant part:

---

7. *See Marshall-Putnam Oil Co. v. Chicago, R.I. & P.R. Co.,* 316 ICC 581, 583 (1962) (weather interference); *Interstate Power Co. v. Chicago, Milwaukee, St. Paul & Pacific RR,* ICC Decision No. 36743 (decided Nov. 21, 1978) (weather interference); *Indiana University Trustees-Petition Seeking Reparation of Demurrage Charges Caused by Severe Winter Weather,* ICC Decision No. 37001 (decided March 14, 1979) (frozen lading); *International Minerals & Chemical Corp. v. Chicago & North Western Transportation Co.,* ICC Decision No. 37131 (decided Nov. 20, 1979) (frozen lading); *Cleveland Electric Illuminating Co. v. Consolidated Rail Corp.,* ICC Decision No. 37342 (decided Aug. 22, 1980) (frozen lading); *Central Illinois Public Service Co. v. Illinois Central Gulf RR,* ICC Decision No. 37358 (decided Aug. 22, 1980) (frozen lading); *Carborundum Co. v. Louisville & Nashville RR,* ICC Decision No. 37330 F (decided Sept. 8, 1980) (severe weather conditions).

8. *See Empire-Detroit Steel Div. v. Interstate Commerce Commission,* 659 F.2d 396, 398 (3d Cir.1981) ("In contrast to straight demurrage, the average agreement, as interpreted by the Commission, bars any demurrage relief for bunching or weather condition."); *Monongahela Power Co. v. Interstate Commerce Commission,* 640 F.2d 504 (4th Cir.1981).

A state authority may only exercise jurisdiction over intrastate transportation provided by a rail carrier ... if such State authority exercises such jurisdiction exclusively in accordance with the provisions of this subtitle.

In sections 214(b)(1) and 214(1), 49 U.S.C. §§ 11501, *et seq.,* the Staggers Act established a federal certification procedure for state agencies wishing to exercise jurisdiction "over intrastate rates, classifications, rules, and practices." 49 U.S.C. § 11501(b)(2). A state may be certified under 49 U.S.C. § 11501(b)(3)(A) if the ICC determines that the state's "standards and procedures are in accordance with the standards and procedures applicable to regulation of rail carriers by the Commission under this title." The Conference Report accompanying section 214 indicates that "[t]he conferees' intent is to ensure that the price and service flexibility and revenue adequacy goals of the Act are not undermined by state regulation of rates, practices, etc., which are not in accordance with these goals." Conf.Rep. No. 1430, 96th Cong., 2d Sess. 106, *reprinted in* 4 U.S.Code Cong. & Ad.News 3978, 4110, 4138 (1980).

The crux of the dispute we must resolve is whether the policy of the ICC to enforce average agreements can be considered a "rule" or "practice" under the Act, thereby requiring conformity by a state railroad commission exercising its authority under the Act. The ICC argues that because the Interstate Commerce Act does not specifically require the enforcement of average agreements, the mandate of section 214(b)(1) that a state exercise jurisdiction "exclusively in accordance with the provisions of this subtitle" is inapplicable. Thus, the ICC contends, whether demurrage agreements are upheld rest within the discretion of a particular state agency. Presumably the state agency could consider elements of local policy, weather, and foreseeability in reaching its determination. Further, the ICC submits that if certain rulings can be considered binding upon state agencies, then only those matters necessary to effectuate the purposes of the Staggers Act are involved, and the enforcement of average agreements is not one such matter. The decision of the ICC here under review is not helpful. As noted above, the opinion does observe that "the I.C.C. generally enforces average agreements," and that "the penalty portion of demurrage could arguably indirectly affect carrier revenues to the extent that it encourages efficient car utilization by shippers." Yet these concerns were insufficient to overturn the Kentucky Commission which, it was held, acted "within the limits of the discretion remaining to the states." We do not agree.

We find that a discrete reading of the statute requires that consistent rulings of the ICC must necessarily be incorporated and adhered to by state commissions exercising jurisdiction pursuant to the Staggers Act. The Interstate Commerce Act expressly requires that rail carriers

compute demurrage charges, and *establish rules* related to those charges, in a way that fulfills the *national needs*—related to—

(1) freight car use and distribution; and

(2) maintenance of an adequate supply of freight cars to be available for transportation of property.

49 U.S.C. § 10750 (emphasis added). Moreover, in regard to demurrage charges, we have held that "[t]he appropriate charge and the period of the free time are set by tariff and have nationwide application." *Central Illinois Pub. Serv. Co. v. Interstate Commerce Commission,* 659 F.2d 820, 821 (7th Cir.1981). It would be patently inconsistent to hold, as the ICC urges, that although the Interstate Commerce Act requires demurrage charges to be computed and the ICC enforces average agreements, the Staggers Act empowers state agencies to suspend these agreements. Such an interpretation finds no support in the statute or legislative history, and, in fact, is contrary to the command of section 11501(b)(3)(A) that a state's procedures and standards be "in accordance with" those of the ICC. Indeed, the conference report reflects the concern that service flexibility

not be "undermined by state regulation of rates, *practices,* etc...." *See* Conf.Rep. No. 1430, *supra* at 9 (emphasis added), U.S. Code Cong. & Admin.News 1978, p. 4138. Thus, whether the ICC's insistence in honoring average agreements is considered a "standard," "procedure," or "practice," it should have been applied by the Kentucky Commission.[9] The decision of the ICC is vacated and the case is remanded to set aside the decision of the Kentucky Commission.

---

9. Given our holding on this issue, we consider it unnecessary to address an additional argument raised by the Railroad, whether the existence of a car service order in effect during a period when some of the demurrage charges accrued divested the Kentucky Commission of jurisdiction.