**MONONGAHELA POWER COMPANY, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Baltimore and Ohio Railroad Company, Intervenor.**

No. 80–1365.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 2, 1980.

Decided Feb. 13, 1981.

---

**17.** Lord Mildew in *Bluff v. Father Gray*, as cited by A. P. Herbert in *The Uncommon Law,* 7th ed., 1950, at p. 313.

John M. Cutler, Jr., Washington, D. C. (Charles J. McCarthy, Belnap, McCarthy, Spencer, Sweeney & Harkaway, Washington, D. C., Ruth E. Kipp, Legal Dept., Monongahela Power Company, Fairmont, W. Va., on brief), for petitioner.

Lawrence H. Richmond, I.C.C., Washington, D. C. (Richard A. Allen, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel; Sanford M. Litvack, Asst. Atty. Gen., John J. Powers, III, Andrea Limmer, Dept. of Justice, Washington, D. C., on brief), for respondents.

John J. Paylor, Cleveland, Ohio, for intervenor.

Before BRYAN, Senior Circuit Judge, and RUSSELL and MURNAGHAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

The winter of 1977–78 was bitter cold. Its after-effects still linger on. Monongahela Power Company seeks relief from an Interstate Commerce Commission order that denied Monongahela reparation of a part of $970,940 in demurrage charges paid to the Baltimore and Ohio Railroad. The share of the $970,940 for which reparation is sought represented not the actual costs of delay for the specific shipments in fact here involved, but rather that portion of the demurrage calculated to provide an inducement or incentive to prompt return which would contribute to an increased efficiency in operation of the rail system generally. The amounts designed to reimburse actual costs of delay are known as compensatory demurrage, and as to that portion of the $970,940, Monongahela does not seek reparation. The portion with which we must deal is known as a demurrage penalty.[1]

Freezing of coal in the freight cars and disruptions associated with a strike of the

---

1. Actually, the demurrage charges do not fit precisely in either classification. *See ICC v. Oregon Pacific Industries, Inc.,* 420 U.S. 184, 190 n.7, 95 S.Ct. 909, 913 n.7, 43 L.Ed.2d 121 (1975): " '[D]emurrage charges are in part compensation and in part penalty; ... in full character they are neither, not being rates as that term is used in connection with rate-making, nor penalties as that term is used in respect to penal impositions. They are sui generis.' " The Supreme Court added: "[D]emurrage charges have a dual purpose; and it is enough if one of them is a deterrent against undue detention of cars." *Id.* at 191, 95 S.Ct. at 914.

We deal, therefore, with a situation where, although Monongahela may have done all within its power to avoid the delay, the cars were nonetheless removed from service. Hence, the delay is no less undue, viewed from the universal point of view of the railroads of the country as a whole, because Monongahela was not at fault. "The freight cars of the Nation thus became in essence a single common pool, used by all roads." *United States v. Allegheny-Lud-*

United Mineworkers Union at Monongahela's Harrison Power Station in Haygood, West Virginia, were the reasons asserted by Monongahela as the proximate causes for the delay in freeing and returning the rail cars.

 In the absence of a special understanding between shipper and carrier, straight demurrage, fixing debits for any detentions beyond free time, applies. There is no bonus in the form of offsetting credits awarded when a car is released before expiration of free time. Frozen lading does generate a two day extension of free time for unloading.[2] In such a straight demurrage situation, the ICC has, with consistency, ordered reparation of the "penalty" portion of demurrage charges on proof that the shipper was not the proximate cause and had acted with due diligence. *E.g. Prince Mfg. Co. v. Norfolk & Western Ry.*, 356 I.C.C. 702 (1978).

To establish its freedom from fault, its due diligence, in an endeavor to establish its case for relief from demurrage penalties, Monongahela introduced evidence that it had installed heating and lump-breaking equipment to expedite unloading, and that it had hired additional personnel and incurred overtime for its regular employees to hasten the freeing and return of the freight cars. The Administrative Law Judge found that Monongahela had not proximately caused the car detentions, and that Monongahela had exercised due diligence. Neither of those findings has been disturbed in the course of the proceedings before the ICC.[3]

However, over and beyond applicable tariffs, for many years there has been in force an "average agreement" between the parties[4] relating to the manner of computing demurrage charges on Monongahela shipments carried by the B&O. The principal purpose of that agreement was to spread demurrage liabilities over all shipments, rather than calculate them solely on an individualized per car basis. In particular, the average agreement provided for credits allowable to Monongahela, as shipper, for early returns of cars prior to expiration of free time. Such early returns could be balanced against late returns, and only to the extent, if any, of a net excess of delayed cars would demurrage be payable.

 The ICC determined that its policy of excusing shippers from demurrage penalties where freedom from fault could be shown had not been, and should not be, applied where the parties, by terms of the average agreement, had otherwise provided for a credit system for minimizing demurrage by assigning values to the shipper's favor in case of early release of freight cars. *See Marshall-Putnam Oil Co. v. Chicago, R. I. & P. R. Co.*, 316 ICC 581, 583 (1962) (weather interference); *Interstate Power Co. v. Chicago, Milwaukee, St. Paul and Pacific Rr.*, ICC Decision No. 36743 (Decided November 21, 1978) (weather interference); *Indiana University Trustees—Petition Seeking Reparation of Demurrage Charges Caused by Severe Winter Weather*, ICC Decision No. 37001 (Decided March 14, 1979) (frozen lading); *International Minerals & Chemical Corp. v. Chicago and North Western Transportation Co.*, ICC Decision No. 37131 (Decided November 20, 1979) (frozen lading); *Cleveland Electric Illuminating Co. v. Consolidated Rail Corp.*, ICC Decision No. 37342 F (Decided August 22, 1980) (frozen lading); *Central Illinois Public Service Co. v. Illinois Central Gulf Rr.*,

*lum Steel Corp.*, 406 U.S. 742, 743, 92 S.Ct. 1941, 1944, 32 L.Ed.2d 453 (1972).

2. Monongahela received such two day extensions, and there is no dispute over entitlement to or receipt of that amelioration applicable to cases of frozen lading.

3. The ALJ ascribed all the delay to frozen lading. "... the strike of the mine workers was a mere exacerbation of the problems created initially by the difficulty in unloading the frozen coal. It is found that frozen ladings were the causal force of the detention." I.C.C. Decision No. 37151, at p. 7.

The parties have expressed no dissatisfaction with that finding, and the case has proceeded solely on a frozen ladings basis.

4. The uninterrupted duration of the average agreement, dating back to 1945, has exceeded 30 years. The average agreement was cancellable at any time by either party, effective on the first day of the month following notice.

ICC Decision No. 37358 (Decided August 22, 1980) (frozen lading); *Carborundum Co. v. Louisville and Nashville Rr.*, ICC Decision No. 37330 F (Decided September 8, 1980) (severe weather conditions). The ICC has consistently determined not to allow a shipper the advantages of both straight demurrage and average agreement demurrage, while excusing it from the corresponding disadvantages of either.

Cases relied on by Monongahela either did not concern situations where average agreements had been entered, or, if an average agreement had been entered, were decided against the claimed reparation of demurrage. For that reason, they are not pertinent. *See Wheeling-Pittsburgh Steel Corp. v. Consolidated Rail Corp.*, ICC Decision No. 36943 (Decided February 23, 1979) (weather conditions and strike); *Federal Chemical Co. v. New York Central Rr.*, 308 ICC 386 (1959) (dealt with meaning of tariff which eliminated demurrage if weather interference made unloading impossible; held demurrage charge not to be abated); *Ford Motor Co. v. Chesapeake & O. Ry.*, 311 ICC 559 (1960) (no reparation granted); *Pennsylvania Rr. v. Kittaning Iron & Steel Mfg. Co.*, 253 U.S. 319, 40 S.Ct. 532, 64 L.Ed. 928 (1920) (the average agreement in that case, unlike the one involved here, provided that no demurrage should be collected when "shipments are frozen in transit so as to prevent unloading during the prescribed free time." The decision, moreover, rested on a conclusion that frozen lading was not sufficiently proven to justify the exemption).

The position adopted by the ICC is unassailable. Though Monongahela claims otherwise, this is not a case of tariff interpretation. To the contrary, the language of Freight Tariff 4-K naming General Car Demurrage Rules and Charges is altogether unambiguous in imposing the demurrage (both compensatory and penalty). The question is simply whether the charge,

clearly applicable, shall nevertheless, under the ICC's discretionary power to abate applicable tariffs and other charges, be forgiven to the extent of the penalty portion of the demurrage on the grounds that, in the circumstances, it is unreasonable. Hence cases such as *Coca-Cola Co. v. Atchison, T. & S. F. Ry.*, 608 F.2d 213, 218 (5th Cir. 1979) treating tariff interpretation as a matter of law, freely reviewable by the courts simply have no application. Instead we are in the area where " '. . . the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.' " *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974), *rehearing denied*, 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975).[5]

Monongahela makes the point that the brief average agreement between it and the B&O simply adopts the General Car Demurrage Rules and Charges, without spelling out any differences as to when and whether demurrage should be abated. It asserts that the same language should be accorded the same meaning and treatment whether it appears as part of a straight demurrage arrangement, or part of an average agreement. The point in no way advances Monongahela's cause. In either event, under straight demurrage or under average agreement, the applicable documents manifestly impose demurrage, penalty as well as compensatory. The difference comes only when the ICC has to decide whether, as a matter of discretion, to abate the penalty demurrage on a finding that the shipper was not the proximate cause and did exercise due diligence.

We have no occasion to investigate a possible clash between the extensive discretion conferred on the ICC and the spectre of arbitrariness which might arise if, in this case, we were dealing with a shipper operating on a straight demurrage basis. The

---

**5.** *Cf. United States v. Pierce Auto Freight Lines*, 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946): "Unless in some specific respect there has been prejudicial departure from requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene." *See also Consolo v. Federal Maritime Commission*, 383 U.S. 607, 621, 86 S.Ct. 1018, 1027, 16 L.Ed.2d 131 (1966); *I.C.C. v. Jersey City*, 322 U.S. 503, 512–13, 64 S.Ct. 1129, 1133, 88 L.Ed. 1420 (1944).

**508**

prior general practice of reparation would, in that case, be a factor of weight on Monongahela's side. However, the B&O had functioned with Monongahela for over 30 years on an average agreement basis. Monongahela has been, consequently, in a position to earn credits for prompt release of cars, and thereby to reduce, overall, the demurrage which would have been payable on a straight demurrage basis.

Those grounds, especially since they have been consistently applied by the ICC in other cases, suffice to make the difference in treatment depending on a difference in contractual arrangements between carrier and shipper, reasonable.

We do not suggest, of course, that the mere existence of the average agreement foreclosed any other outcome. Presumably the power of the ICC to excuse payment of charges for justifiable reasons was still paramount. But the fact that the ICC *may* do something is no authority for the proposition that it *must* do it. The decision to deny reparation in the present case was neither arbitrary nor capricious nor unreasonable, nor an abuse of discretion. 5 U.S.C. § 706 (The Administrative Procedure Act).

*AFFIRMED.*