The CLEVELAND ELECTRIC ILLUMINATING COMPANY, Petitioner,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,

Consolidated Rail Corporation (80–3727), Norfolk and Western Railway Company (80–3792), Baltimore and Ohio Railroad Company (80–3793), Intervenors.

Nos. 80–3727, 80–3792 and 80–3793.

United States Court of Appeals, Sixth Circuit.

Argued May 5, 1982.

Decided Aug. 12, 1982.

Charles J. McCarthy, John M. Cutler, Jr., Belnap, McCarthy, Spencer, Sweeney & Harkaway, Washington, D. C., for petitioner.

Sidney L. Strickland, Jr., Richard A. Allen, Kathleen V. Gunning, Gen. Counsels, I. C. C., Benjamin R. Civiletti, Atty. Gen. of the U. S., John J. Powers, III, Kenneth P. Kolson, U. S. Dept. of Justice, Washington, D. C., for respondents.

Anne E. Treadway, Consol. Rail Corp., Philadelphia, Pa., for intervenor Consol. Rail Corp.

Before KEITH, MERRITT and JONES, Circuit Judges.

PER CURIAM.

The sole issue for review is whether the Interstate Commerce Commission erred in refusing to exercise its discretionary power to abate penalty demurrage charges assessed when severe weather conditions prevented Cleveland Electric Illuminating Company from releasing rail cars promptly.

BACKGROUND

Demurrage is an expense shippers incur for retaining rail cars beyond the "free time" period.[1] Demurrage charges are an integral part of the established rules and regulations relating to the use and movement of rail cars. The charges are neither rates nor penalties, rather, they have a unique status as car service rules. Demurrage charges serve two purposes. First, they compensate railroads for the lost opportunity to profit from the use of their cars. *Iversen v. United States,* 63 F.Supp. 1001, 1005 (D. D.C.), *aff'd.,* 327 U.S. 767, 66 S.Ct. 825, 90 L.Ed. 998 (1946). Second, they promote the overall efficiency of the rail system by creating an incentive to return the cars promptly. *Id.*

---

1. Free time is that period of time which, under normal circumstances, affords the shipper a sufficient opportunity to unload a car and release it to the railroad.

The national tariff, Freight Tariff 4K, ICC H–74 General Car Demurrage Rules and Charges ("Tariff"), offers shippers two alternative methods for computing demurrage: straight demurrage or an average demurrage agreement. Shippers have the option of selecting the demurrage agreement which best meets their needs. A shipper may, upon providing one month's notice, select a different demurrage agreement at any time.

Straight demurrage is applied in the absence of any other arrangement between shipper and carrier. Straight demurrage does not provide an affirmative "reward" for releasing cars early. Cars detained beyond free time incur "debits". The amount of these debits increases with the length of time the car is detained. The Tariff provides relief from demurrage charges assessed where unloading is impeded by frozen lading, bad weather, strikes, or bunching.[2] For example, where the lading is frozen, a shipper may obtain two additional days of free time.

█ In addition to the relief available under the Tariff for straight demurrage agreements, the Interstate Commerce Commission ("Commission") may, in its discretion, excuse penalty demurrage.[3] This relief is contingent upon the shipper demonstrating that it was not the proximate cause of the detention and that it took all reasonable steps to minimize the accumulation of demurrage. See Prince Manufacturing Co. v. Norfolk & Western Ry. Co., 356 I.C.C. 702, 706 (1978).

An average agreement is the alternative to straight demurrage. Average agreements spread demurrage liabilities over all shipments, rather than calculating them solely on an individualized per car basis. The key feature of the agreement is its

provision for offsetting debits incurred on cars held beyond free time with credits earned on cars released before the expiration of free time. The Tariff does not provide relief such as additional free days where the detention is caused by bunching or weather interference. In fact, in most circumstances, the shipper must pay the charges unless it can offset the debits with credits. Item 1420(4) of the Tariff, however, grants shippers two extra days of free time where the lading is frozen.

FACTS

During the first three months of 1978, the Baltimore and Ohio Railway Company, Consolidated Rail Corporation, and Norfolk and Western Railway Company ("Railroads") delivered coal to several Cleveland Electric Illuminating Company ("CEI") plants. Cold weather and snow froze the coal inside the rail cars. Consequently, CEI had difficulty unloading the coal and did not release many rail cars within the free time period. The Railroads, therefore, assessed several thousand dollars in demurrage against CEI pursuant to average agreements which had been in effect for over 50 years. On December 28, 1979, CEI filed three complaints with the Commission which alleged that the penalty demurrage assessed under the average agreements were unreasonable and violated the Interstate Commerce Act. The Commission held that it would not excuse penalty demurrage where an average agreement provided for an alternative form of relief, a credit-debit system of minimizing demurrage. CEI appeals.

I.

█ The Commission has both expertise and discretion in developing regulations

---

2. Bunching occurs where the railroad delivers cars in numbers exceeding the anticipated, daily rate of delivery.

3. Penalty demurrage is that portion of the demurrage charge which is greater than the amount designed to compensate the carrier for its losses and expenses resulting from the detention.

The Interstate Commerce Commission ("Commission") has the authority to regulate the practices which affect the supply and utilization of freight rail cars. Pursuant to this authority the Commission may find demurrage charges inapplicable or unreasonable, and order refunds of overcharges or reparations. See, e.g., Prince Manufacturing Co. v. Norfolk & Western Ry. Co., 356 I.C.C. 702, 706 (1978).

in matters relating to interstate commerce. *See United States v. Pierce Auto Freight Lines,* 327 U.S. 515, 535–36, 66 S.Ct. 687, 697–98, 90 L.Ed. 821 (1946). Courts cannot, as CEI implicitly suggests, determine the content of national transportation policy. "The court may not substitute its judgment for that of the agency." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447. *See Pierce Auto Freight Lines,* 327 U.S. at 536, 66 S.Ct. at 698. This action does not involve the construction of a tariff. Had CEI alleged that the demurrage charges were inapplicable, an issue of law would have been presented. The Court could then freely review the Commission's construction of the tariff. *See, e.g., Coca-Cola v. Atchison, T. & S.F. Ry. Co.,* 608 F.2d 213, 218–219 (5th Cir. 1979).

█ In the present case, however, all parties admit the charges are applicable. Therefore, the only issue presented is a question of fact, whether the charges are reasonable and consistent with Commission policy. See *Illinois Central Railroad v. Interstate Commerce Commission,* 206 U.S. 441, 459, 27 S.Ct. 700, 706, 51 L.Ed. 112 (1907). This Court's scope of review is limited to determining whether the Commission's policy has been consistently and fairly applied in a manner which is not arbitrary and capricious. *See Bowman Transportation, Inc.,* 419 U.S. at 285, 95 S.Ct. at 442; *Pierce Auto Freight Lines,* 327 U.S. at 536, 66 S.Ct. at 698. ("Unless in some specific respect there has been a prejudicial departure from requirements of the law or an abuse of the Commission's discretion, the reviewing court is without authority to intervene.") *See also Atchinson, T. & S. F. Ry. Co. v. Wichita Board of Trade,* 412 U.S. 800, 806, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973). The Commission need only articulate a "rational connection between the facts found and the choice made." *Bowman Transportation, Inc.,* 419 U.S. at 285, 95 S.Ct. at 442.

## II.

█ CEI argues that: 1) there exists no rational basis for supporting the Commission's policy; and 2) the Commission has not been consistent in denial of relief from penalty demurrage where an average agreement provides for an alternative form of relief. CEI attacks the Commission's policy of not excusing penalty demurrage where an average agreement is in effect on several grounds. First, penalty demurrage represents an arbitrary windfall to the Railroads since it cannot create a further incentive to promote the efficient use of rail cars. Allegedly, all reasonable steps had been taken to prevent delays occasioned by the severe weather conditions. Second, an average agreement's credit-debit arrangement is inadequate relief where, as here, the penalties a shipper may incur greatly exceed the maximum credits which can be obtained through diligence. Finally, there is nothing in the language of the average agreement or the tariff which precludes the Commission from granting relief from penalty demurrage. We find these arguments unpersuasive.

Over the long-run, the credit-debit system of an average agreement provides adequate relief from demurrage incurred by a diligent shipper. CEI has been a party to an average agreement with the Railroads for over 50 years. During this period, the Commission has, with the possible exception of a 10 year period over 20 years ago, held that relief from penalty demurrage was only available to shippers under straight demurrage agreements. Now that severe weather has reduced the advantage of average agreements in the short-run, CEI contends that all demurrage agreements should be treated alike. CEI was aware of the benefits and the drawbacks of the respective agreements. CEI made a business decision to retain its average agreements. Moreover, CEI failed to exercise its option of canceling the average agreement at any time. We hold that the Commission's policy of maintaining a distinction between straight demurrage and average agreements is a fair and rational policy decision. *See Monongahela Power Co. v. Interstate*

*Commerce Commission*, 640 F.2d 504, 507 (4th Cir. 1981), *cert. denied,* ─── U.S. ───, 102 S.Ct. 111, 70 L.Ed.2d 97 (1981); *Empire-Detroit Steel Division of Cyclops Corp. v. Interstate Commerce Commission*, 659 F.2d 396 (3d Cir. 1981).

█ The Commission maintains that it has consistently applied its policy of not excusing penalty demurrage where an average agreement is in effect. *See Marshall-Putnam Oil Co. v. Chicago, R. I & P. R. Co.*, 316 ICC 581, 583 (1962) (weather interference); *Interstate Power Co. v. Chicago, Milwaukee, St. Paul and Pacific Ry.*, ICC Decision No. 36743 (Decided November 21, 1978) (weather interference); *Indiana University Trustees-Petition Seeking Reparation of Demurrage Charges Caused by Severe Winter Weather*, ICC Decision No. 37001 (Decided March 14, 1979) (frozen lading); *International Minerals & Chemical Corp. v. Chicago and North Western Transportation Co.*, ICC Decision No. 37131 (Decided November 20, 1979) (frozen lading); *Cleveland Electric Illuminating Co. v. Consolidated Rail Corp.*, ICC Decision No. 37342 F (Decided August 22, 1980) (frozen lading); *Central Illinois Public Service Co. v. Illinois Central Gulf Ry.*, ICC Decision No. 37358 (Decided August 22, 1980) (frozen lading); *Central Illinois Public Service Co. v. Illinois Central Gulf Rr.*, ICC Decision No. 37358 (Decided August 22, 1980) (frozen lading); *Carborundum Co. v. Louisville and Nashville Ry.*, ICC Decision No. 37330 F (Decided September 8, 1980) (severe weather conditions). We agree. Many of the cases CEI cites in support of its position that the Commission has treated similarly situated shippers using average agreements differently were expressly considered and found not persuasive by the Fourth Circuit. *See Monongahela Power Co.*, 640 F.2d at 507. Moreover, assuming arguendo that the cases cited by CEI hold that the Commission has granted relief from penalty demurrage, this would not constitute arbitrary action. The Commission decisions upon which CEI relies date from 1949 to 1960 and are over 20 years old. Recent cases addressing the issue presented in this appeal have been uniform in their adherence to the policy that penalty demurrage should not be excused where an average agreement is in effect. We join the Third and Fourth Circuits in holding that the Commission has consistently applied this policy. *Monongahela Power Co.*, 640 F.2d at 508; *Empire-Detroit Steel Division of Cyclops Corp.*, 659 F.2d 396.

█ We do not suggest, of course, that the mere existence of the average agreement foreclosed any other outcome. Presumably the Commission has the power to excuse penalty demurrage where an average agreement is in effect. However, what the Commission may do is very different from what it must do. In the present case we find that the Commission's decision to deny relief to shippers with average agreements was consistent with its long-standing policy and well within its discretion. The Commission's decision was not capricious, arbitrary, or unreasonable, nor does it constitute an abuse of discretion. Accordingly, we affirm the order of the Commission.

MERRITT, Circuit Judge, dissenting.

I disagree with the Court's conclusion that the reasoning employed by the ICC in denying relief from the penalty demurrage charges was not arbitrary or capricious.

The Commission stated that its refusal to consider the reasonableness of refunding the penalty portion of the demurrage charges was based on "longstanding Commission policy" which regards an average agreement as a concession from straight demurrage in favor of the shipper. The shipper under an average agreement, by releasing cars prior to the expiration of free time, can earn credits which partially offset debits received when cars are kept beyond free time. Under a straight demurrage agreement, no provision is made for offsetting debits with credits. According to this "longstanding policy" governing average contracts, the quid pro quo given in exchange for the right to offset debits is that no additional relief from the demurrage charges for delay caused by weather interference is permitted. A shipper under a straight demurrage agreement, but not un-

der an average contract, may recover the penalty portion of demurrage if he exercised due diligence and was not the proximate cause of the delay.

I do not doubt that the above-described policy is "long-standing," but I dissent because I find little or no consistency in its application. In a number of cases the Commission has considered the appropriateness of relief from penalty demurrage, applying the proximate cause and due diligence tests, even though the agreement in question was an average agreement. *In Davison Chemical Co. v. New York Central R.R. Co.*, 296 ICC 744 (1955) and *United States Trucking Corp. v. New York N. H. & H. R.R. Co.*, 274 ICC 552 (1949) the Commission found that the complainant exercised due diligence and was not the proximate cause of the delay and granted relief from the demurrage charges in full or in part. In *Ford Motor Co. v. Chesapeake & O. Ry. Co.*, 311 ICC 559 (1960) the Commission specifically stated that the due diligence and proximate cause tests were satisfied and that relief from penalty demurrage was appropriate; however, no relief was granted because the Commission found that the demurrage charge did not include a penalty portion. In *International Paper Co. v. Bangor & A. R.R. Co.*, 279 ICC 449 (1950); *Federal Chemical Co. v. New York Central R.R. Co.*, 308 ICC 386 (1959); and *Ormet v. Illinois Central R.R. Co.*, 341 ICC 649 (1972) the Commission denied relief, finding that the due diligence and proximate cause tests were not satisfied. In each of these cases an average agreement was in effect; however, in none of these cases did an average agreement foreclose consideration of the reasonableness of penalty demurrage. It is apparent that the Commission has one line of cases which prevent consideration of the reasonableness of weather related penalty demurrage charges under an average contract and another line of cases in which the existence of an average contract is not considered a bar to consideration of the reasonableness of penalty demurrage.

In its decisions in the instant cases the Commission did not distinguish—in fact, did not even acknowledge—this second line of cases. In its brief, however, the Commission dismisses these cases as "an aberration from the mainstream of Commission precedent." (Respondent brief at 34). I merely conclude that such unexplained "aberrations" constitute arbitrary and capricious behavior by a governmental agency. *See, e.g. Atchison, T. & S.F. Ry. Co. v. Wichita Board of Trade*, 412 U.S. 800, 808–09, 93 S.Ct. 2367, 2375–76, 37 L.Ed.2d 350 (1973); *Ohio Fast Freight, Inc. v. United States*, 574 F.2d 316, 319 (6th Cir. 1978). I would remand the case to the Commission for further consideration in light of the clear conflict that exists in the Commission's treatment of the issue.